UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| THOMAS HARTMANN,<br><br>                    Plaintiff,<br><br>        vs.<br><br>ARTHUR J. GALLAGHER & CO.<br><br><br>                    Defendant. | Civil Case No..:<br><br><br>**COMPLAINT** |

Plaintiff, Thomas Hartmann, by way of Complaint against the defendant, says:

## JURISDICTION

1.     Plaintiff is a citizen of the State of New Jersey and a resident of Morris Plains, New Jersey.

2.     Defendant is a Delaware corporation with a principal place of business at 2850 W. Golf Road, Rolling Meadows, Ill.

3.     The amount in controversy herein exceeds $75,000, such that the court has jurisdiction pursuant to 28 U.S.C. § 1332.

## FIRST COUNT

4.     On or about October 14, 2019 the Plaintiff and Defendant entered into an "Employment Agreement", a copy of which is attached hereto as Exhibit "A".

5.     Plaintiff came to be employed by the Defendant pursuant to said Agreement and stayed in the Defendant's employment until September 3, 2021, as a result of his having resigned his employment.

1

6.      In resigning from his employment Plaintiff relied upon Paragraph 5 of the Agreement entitled "Termination of Employment Relationship".

7.      Paragraph 5 of the Agreement provides, inter alia, that each party has the right to terminate the employment relationship for cause, or for no cause, following which certain compensation was to be paid to the employee. In general terms, Section 5 provides that the company can terminate the employment relationship upon the death of the employee or the employee being disabled so as not to be able to perform his duties, and sets forth, as well, certain bases for termination for Cause.

8.      Defendant did not terminate Plaintiff's employment.

9.      Section 5D also provides for certain "Good Reason" permitting plaintiff to have to resigned, including "(iii) an unacceptable change in Employee's immediate manager as set forth in Section 5B(g)", which specifies that the employee

> "must be provided 30 days written notice by the Company of any changes to the employee's immediate manager and if the employee is not agreeable to such change it would be considered "Good Reason" per Section 5D.

10.     Defendant did provide verbal, but not written, notice of its intent to change the employee's immediate manager and the Plaintiff objected.

11.     Section 5D also provides, in relevant part:

> In the case of termination of Employee's employment with the Company where forty five (45) days' notice of such termination is required to be given by either party under this Agreement (such forty five (45) day notice period hereinafter referred to as the "Notice Period"), the Company agrees to continue in effect during the Notice Period the compensation and benefits to which Employee may be

2

entitled under Section 3 of this Agreement.  It is understood and agreed that at the expiration of the Notice Period, Employee's entitlement to such compensation and benefits shall cease **except that in the event the Company terminates Employee's employment for reasons other than as set forth in Section 5.B above or by Employee for "Good Reason" (as defined below), or for no reason by the Company or Employee, the Company shall be obligated to pay to Employee Separation Pay** (Emphasis added.)

\* \* \*

12.     Plaintiff resigned his employment because of a change in his immediate manager, as to which he not agreeable, the Defendant's failure to provide proper written notice, and for "no reason by the company or employee", and hence Plaintiff is entitled to "Separation Pay" as set forth in the Agreement.

13.     The verbiage ". . . . or for no reason by the Company or Employee" was a specifically negotiated term between the Plaintiff and the Defendant, entitling Plaintiff to resign "for no reason"

14.     Notwithstanding the foregoing the Defendant has failed and refused to recognize its obligations under the "Employment Agreement" and the Plaintiff is entitled to judgment for all monies due and owing to date under said Agreement.

**WHEREFORE** plaintiff demands judgment against defendant for all monies due and owing to the date of judgment, together with interest and cost of suit.

## SECOND COUNT

15.     Plaintiff repeats and re-alleges each and every allegation contained in the First Count and incorporates the same herein as if set forth in length.

16.     To the extent that the date of judgment may precede the termination of Plaintiff's

entitlement to Separation Pay, the Plaintiff seeks a Declaratory Judgment that Defendant owes Plaintiff "Separation Pay" pursuant to Paragraph 5 of the Employment Agreement for the full length of Defendant's obligations thereunder.

**WHEREFORE** plaintiff demands s Declaratory Judgment that defendant must pay all "Separation Pay" under the Agreement, together with interest and cost of suit.

## THIRD COUNT

17.    Plaintiff repeats and re-alleges each and every allegation contained in the First Count and incorporates the same herein as if set forth in length.

18.    Defendant has acted willfully and in bad faith in refusing to pay Plaintiff the benefits to which he is entitled and Defendant is accordingly responsible for the Plaintiff's counsel fees and consequential damages and such other relief as the Court may deem just or equitable.

Dated: September 20, 2021

GENNET, KALLMANN, ANTIN,
SWEETMAN & NICHOLS, P.C.
Attorneys for Plaintiff
I.D. #. 009471982
1 Gatehall Drive, Suite 300
Parsippany, New Jersey 07054
Our File No.: 21-9419:310.0001-K

By: _____
       STANLEY W. KALLMANN, ESQ.

# EXHIBIT A

<u>**EMPLOYMENT AGREEMENT**</u>

This EMPLOYMENT AGREEMENT (this "<u>Agreement</u>") is made and entered into as of the Effective Date (as defined below) by and between Thomas Hartmann (hereinafter referred to as "<u>Employee</u>") and Arthur J. Gallagher & Co., a Delaware corporation with its principal place of business in Rolling Meadows, Illinois ("<u>AJG</u>") and its subsidiaries, divisions and affiliated and related companies (hereinafter referred to collectively as the "<u>Company</u>").

<u>**RECITALS**</u>

WHEREAS, the Employee is a member, officer, director and/or key employee of RPA Insurance Services, LLC and Innovative Coverage Concepts, LLC (the "<u>Acquired Business</u>"), substantially all the goodwill and other assets of which are being acquired by the Company in a transaction being completed contemporaneously with this Agreement ("<u>Transaction</u>") pursuant to an Asset Purchase Agreement dated May 16, 2019 by and among AJG, Arthur J. Gallagher Risk Management Services, Inc. ("<u>Subsidiary</u>"), and the Acquired Business (the "<u>Asset Purchase Agreement</u>");

WHEREAS, Employee is being hired to be a valued key employee who with the execution of this Agreement will be provided and will continue to be provided during his employment with valuable confidential and proprietary information of the Company and will have significant managerial, production and/or account servicing responsibilities for the Company; and

WHEREAS, the parties acknowledge that the Company has a legitimate interest in retaining the services of the Employee and the taking of the covenants herein in order to preserve the goodwill, customer relationships and value of the business to be handled by the Employee including the Acquired Business; and

WHEREAS, the execution of this Agreement is a condition to the effectiveness of the aforesaid Transaction.

NOW, THEREFORE, in consideration of the above recitals, mutual covenants and agreements set forth below, and for other good and valuable consideration, including but not limited to, employment with the Company, the compensation and benefits described herein, receipt and the ability to utilize the Company's confidential and proprietary information, and being provided and/or allowed access to and contact with certain Company accounts, the sufficiency of which the parties hereby acknowledge, the parties agree as follows:

<u>SECTION 1.</u>      <u>Employment and Term.</u>

The parties agree that the Effective Date of this Agreement shall be May 16, 2019. The Company agrees to employ Employee and Employee agrees to serve the Company and perform the duties set forth below for a term beginning on the Effective Date and ending on October 31, 2024 (the "<u>Contract Term</u>")

unless earlier terminated by either party as provided in Section 5 below.  After the Contract Term, Employee's employment with the Company shall automatically continue as an at-will employment except that the parties agree that Employee's employment may not be terminated by either Employee or the Company without forty five (45) days written notice by either party who wishes to terminate Employee's employment with the Company; except in case of Employee's termination for Cause, or by Employee for Good Reason, which shall be governed by the provisions of Section 5 below.  The parties agree that even after the Contract Term, Employee's continued employment thereafter shall be subject to the terms and conditions of this Agreement, except for those contained in Section 3.

SECTION 2.     Duties.

A.   Employee shall be obligated and responsible for soliciting, handling business for, selling insurance and rendering services related to Insurance Services and Benefit Services (as hereinafter defined) on behalf of the Company and its subsidiaries.  Employee agrees to devote his full energies, abilities, attention and business time to the performance of his employment obligations and responsibilities.  Employee further agrees that he will not engage in any activity which conflicts or interferes with, or in any way compromises, his performance of those obligations and responsibilities. Employee agrees to comply with all Company policies and procedures in effect and applicable to him. Employee shall not, either during or outside normal business hours, directly or indirectly, sell, solicit, service, or manage insurance business, or engage in any aspect of the insurance business for or on behalf of any person or entity other than the Company, nor engage in any activity inimical to the best interests of the Company.  Notwithstanding the foregoing, nothing in this Agreement shall prevent or be deemed to prohibit Employee from spending reasonable amounts of business or time: (i) on charitable and other non-profit affairs; (ii) insurance industry affairs; (iii) continuing education programs; (iv) client organizations and associations; (v) the wind-up affairs of the Acquired Business; and (vi) any service, time or participation related to service on a board of directors or status as a shareholder or passive investor in any business concern; provided, however, that such participation and time expended in such activities does not unreasonably interfere with the performance of Employee's duties to the Company and complies with Employee's obligations hereunder.

As used in this Agreement, the following definitions shall apply:

"Insurance Services" shall mean transferring, placing, marketing, accepting, aiding, counseling or consulting in the placement, renewal, discontinuance or replacement of any insurance (including self-insurance) by, or handling self-insurance programs, insurance claims, risk management services or other insurance administrative or service functions.

"Benefit Services" shall mean providing employee benefit brokerage, consulting, or administration services, in the area of group insurance, defined benefit and defined contribution pension

plans, individual life, disability and capital accumulation products; investment advisory services, wealth management, or group retirement services; defined benefit and defined contribution pension services; human resource consulting services, including without limitation, compensation consulting, compensation program design, compensation and benefits surveys, and human resources management; and all other employee benefit or human resource areas in which the Company is involved.

B.     Employee's title shall be Area Vice President – Programs, but it shall not be a breach of this Agreement if such title is changed or varied.   Employee also shall undertake those duties that are reasonably assigned to him by his immediate manager, consistent with Employee's experience.

C.     Employee recognizes that, by virtue of the Transaction and his employment by the Company and to assist him in the solicitation, production, management, and/or servicing of accounts, he will be provided and granted otherwise prohibited access to certain confidential and proprietary data and information of the Company (including the Acquired Business) which is not known either to its competitors or within the insurance agency, consulting and brokerage business generally and which has independent economic value to the Company.  This information (hereinafter referred to as "Confidential Information") includes, but is not limited to: data relating to the Company's unique marketing and servicing programs, procedures and techniques; retirement plan consulting, variable annuities, and fund investment business and related products and services; business, management and human resources/personnel strategies; details of salary, bonus and other compensation arrangements of Company employees other than Employee; the criteria and formulae used by the Company in pricing its insurance and benefits products and claims management, loss control and information management services; the structure and pricing of special insurance packages that the Company has negotiated with various underwriters; highly sensitive information about the Company's agreements and relationships with certain underwriters; sales data contained in various tools and resources (including, without limitation, Salesforce.com); lists of prospects; the identity, authority and responsibilities of key contacts at Company accounts; the composition and organization of Company accounts' businesses; the peculiar risks inherent in the operations of Company accounts; highly sensitive details concerning the structure, conditions and extent of existing insurance coverages of Company accounts; policy expiration dates relating to Company accounts; premium amounts relating to Company accounts; commission rates relating to Company accounts; risk management service arrangements relating to Company accounts; loss histories relating to Company accounts; candidate and placement lists relating to Company accounts; and other data showing the particularized insurance or consulting requirements and preferences of Company accounts.  Employee recognizes and agrees that part of his duties may include assisting in the development of information and data that is Confidential Information belonging to the Company.  Confidential Information may be stored

in files, documents, dailies, daily reports, renewal information, customer lists, accounting records, products purchased by customers, customer account and credit data, referral sources, computer programs and software, customer comments, Company written manuals and marketing and financial analysis, plans, research and programs.  Employee recognizes that this Confidential Information constitutes valuable property of the Company, developed over a long period of time and at substantial expense and that the Company takes reasonable efforts to keep this Confidential Information confidential and made available only to those employees who need access to such Confidential Information to perform their job functions for the Company.  Employee agrees that he will not, at any time during his employment by the Company except in the ordinary course of business of the Company, divulge such Confidential Information or make use of it for his own purposes or the purposes of another.

D.   The Company agrees that, during Employee's employment with the Company, it shall: (i) provide Employee with access to certain Confidential Information the Employee did not previously possess, including, but not limited to, Confidential Information about certain of the Company's accounts; (ii) provide Employee with information and access to the Company's proprietary insurance and risk management programs; (iii) provide Employee with access to the Company's specialized business operations relating to particular aspects of the insurance agency and risk management business; (iv) maintain specialized training programs for which Employee may qualify and apply; and (v) provide such other assistance the Company deems appropriate to reasonably aid Employee in performing his sales, management and/or servicing duties.

E.   Employee acknowledges and understands that an essential element of the Company's business is the development and maintenance of personal contacts and relationships with its accounts, and that Employee will be provided and allowed access to certain of the Company's accounts for the purpose of establishing personal contact and relationships with such accounts for the benefit of the Company. Employee acknowledges and understands that the Company invests considerable time, money, and resources necessary to develop and maintain a relationship between its employees and a client, and in that regard, the Company will pay Employee's salary, reimburse reasonable business expenses, provide Employee with certain Confidential Information, and provide the resources necessary to service the Company accounts managed or serviced by Employee by making available legal advice, accounting support, advertising and other corporate services.  Moreover, although Employee acknowledges and understands that certain of the Company's accounts may develop an identification with Employee rather than the Company itself, all such accounts shall at all times be Company accounts for all purposes and Employee disclaims any interest in any such Company accounts.

F.   Notwithstanding this Section 2, or the generality of any prohibition relating to Confidential Information appearing in this Agreement, Employee acknowledges the following important exceptions under state or federal law:

(1)   Employee is not prohibited from reporting possible violations of federal law or regulation to any governmental agency or entity including, without limitation, the Department of Justice, the Securities and Exchange Commission, the Congress, and any agency Inspector General, or making other disclosures that are protected under the whistleblower provisions of federal law or regulation.

(2)   The Federal Defend Trade Secrets Act of 2016 provides the following:

IMMUNITY FROM LIABILITY FOR CONFIDENTIAL DISCLOSURE OF A TRADE SECRET TO THE GOVERNMENT OR IN A COURT FILING.

a)   IMMUNITY. An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that:

I.   is made

i)   in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and

ii)   solely for the purpose of reporting or investigating a suspected violation of law; or

II.   is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

b)   USE OF TRADE SECRET INFORMATION IN ANTI-RETALIATION LAWSUIT. An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual:

I.   files any document containing the trade secret under seal; and

II.   does not disclose the trade secret, except pursuant to court order.

SECTION 3.    Compensation and Benefits.

A.   Salary. Employee shall receive an annual base salary ("Base Salary"), which initially shall be $265,000 per year payable in semi-monthly installments in arrears. Employee's Base Salary shall be reviewed annually and will be subject to adjustment at the discretion of the Company.

B.   Additional Compensation. Employee shall be entitled to a bonus equal to 5% of the increase in annual Net Revenues (a "Revenue Increase"). "Net Revenues" shall mean revenues collected by the Company (or an affiliate thereof) during an Employment Year from the program business from the Acquired Business. The annual Revenue Increase shall be calculated by being measured against the greater of (i) the Net Revenues in the immediately prior Employment Year, or (ii) the Base Revenues.

For the purposes of this Agreement, the Net Revenues in the first Employment Year shall be measured against $4,300,000 (the "Base Revenues") to determine whether there has been an increase in annual Net Revenues during the first Employment Year. Notwithstanding anything to the contrary set forth above, for the purposes of determining such compensation, each of the following conditions shall apply:

(1)   Such additional compensation shall include only revenues received by the Company during the Contract Term, shall only be included once, shall include only commissions and fees derived exclusively by the Acquired Business as determined in accordance with the policies and procedures of the Company, shall not include amounts paid by the Company to third parties, such as co-brokerage or sub-brokerage, and shall not include contingent and supplemental commissions;

(2)   As used in this section, the term "Employment Year" shall mean the 12-month periods commencing on May 1, 2019, 2020, 2021, 2022 and 2023 during which Employee is employed by the Company under this Agreement or such shorter period thereof if the Employee's employment terminates before the end of an Employment Year;

(3)   As used in this section, the term "affiliate" shall mean, with respect to any person, any person that directly or indirectly controls, is directly or indirectly controlled by or is directly or indirectly under common control with such person; and

(4)   Company and Employee agree that the intent of the one-year period for measuring revenues received is to allow for inclusion of one insurance renewal cycle for the clients in each such period. Accordingly, to the extent that an unusual timing of payment of a renewal premium by a client or other event would distort unfairly one or more one-year periods, the parties agree to equitably adjust revenues to one-year periods and allow for more meaningful measurement and comparison.

C.   Employee Benefits.   While employed by the Company, Employee shall be eligible for the customary benefits afforded to similarly situated employees of the Company. Employee shall be entitled to participate in employee benefit plans now or hereafter provided or made available to the Company's employees generally, such as group hospitalization and medical, life and disability insurance. Nothing in this Agreement shall require the Company to establish, maintain, or continue any of the employee benefits already in existence for employees of the Company and nothing in this Agreement shall restrict the right of the Company to amend, modify or terminate such employee benefit programs.

D.   Vacations.   Employee shall be entitled each year to vacation benefits in accordance with the policies of the Company. Employee shall be entitled to not less than 20 days of vacation each year. The Company shall not pay Employee any additional compensation for any vacation time not used by Employee unless required by law. Employee will be provided reasonable opportunity to use accrued vacation time, upon prior written request and subject to the business needs of the Company. Unused

vacation time may be carried over to a subsequent year only in accordance with the policies of the Company.

E.   <u>Expenses.</u>   Employee shall be entitled to reimbursement of reasonably incurred business expenses in accordance with, and subject to the limitations of, Company's policies and practices.

F.   <u>Training.</u>   The Company shall provide Employee with the customary internal training that is normally offered similarly situated employees of the Company.

SECTION 4.      <u>Representations.</u>

Employee represents and warrants to the Company that, except as he may be so bound by the Acquired Business:

A.   He is not, and will not become a party to any agreement, contract, arrangement or understanding, whether of employment or otherwise, that would in any way restrict or prohibit him from undertaking or performing his duties in accordance with this Agreement or that restricts his ability to be employed by the Company in accordance with this Agreement;

B.   His employment by the Company will not violate the terms of any policy of any prior employer of Employee regarding competition;

C.   His position with the Company, as described in this Agreement, will not require him to improperly use any trade secrets or confidential or proprietary information of any prior employer, or any other person or entity for whom he has performed services;

D.   He has not misused, and will not misuse, any confidential or proprietary information he has obtained from any prior employer or any other person or entity;

E.   He has not copied, saved, downloaded, or otherwise retained in any form whatsoever any confidential or proprietary information of any prior employer or any other person or entity; and

F.   He is in compliance with any non-competition and/or non-solicitation agreements, or other restrictive covenant obligations in place between him and any former employer and will continue to be in compliance, regardless of whether he believes such agreements and/or restrictive covenants are enforceable or not.

SECTION 5.      <u>Termination of Employment Relationship.</u>

A.   Either party shall have the right to terminate Employee's employment with the Company at any time upon forty five (45) days written notice to the other party.

B.   The Company shall have the right to terminate the employment of Employee at any time, with no liability on the part of the Company under this Agreement or otherwise, upon the happening of any of the following:

(1)   The death of Employee;

(2)   Employee becoming disabled to the extent that he is unable to perform, after reasonable accommodations have been made, his essential job duties for (a) period of one hundred eighty (180) or more consecutive days or (b) a period amounting to two hundred ten (210) days within any rolling twelve (12) month period;

(3)   Employee's employment has been terminated for Cause.  As used herein, the term "Cause" shall mean a termination of employment based upon the good faith determination of the Company that one or more of the following events has occurred:

a)   Material breach of this Agreement by Employee after having been given written notice of such breach, which notice shall be at least ten (10) days but no more than thirty (30) days depending upon the particular facts and circumstances involved in the material breach and the failure of Employee to remedy or cure any such breach within thirty (30) days after written notice to Employee;

b)   Employee has committed a dishonest act or any fraud in the performance of his duties on behalf of the Company which results in demonstrable damage to the business or reputation of the Company;

c)   Employee has been convicted (including a plea of guilty or no contest) of a crime involving moral turpitude or for any felony;

d)   Employee's unlawful use (including being under the influence of) or possession of illegal drugs;

e)   The loss, for any reason, by Employee of any license or professional registration necessary to the performance of Employee's duties, which loss continues without reinstatement for a period in excess of thirty (30) days without the Company's written consent;

f)   Material violation of the Company's policies and procedures including, without limitation, finance policies, human resource policies and the Global Standards of Business Conduct by Employee and failure to cure any such matter that is capable of being cured within thirty (30) days after the Company notifies Employee in writing of such violation;

g)   Continuing failure of Employee to perform his duties (other than as a result of disability), which duties Employee has been directed in writing to perform by Employee's immediate manager and failure to cure any such matter that is capable of being cured within thirty (30) days after the Company notifies Employee in writing of such failure.  The Employee must be provided 30 days written notice by the Company of any changes to the Employee's immediate manager and if the Employee is not agreeable to such change it would be considered "Good Reason" per section 5D. ; or

h)   Conduct on the part of Employee inconsistent with the covenants set forth in Section 8 below.

C.   It is understood and agreed that upon termination of Employee's employment with the Company when such termination is for Cause, Employee's entitlement to further compensation and benefits shall cease immediately.

D.   In the case of termination of Employee's employment with the Company where forty five (45) days' notice of such termination is required to be given by either party under this Agreement (such forty five (45) day notice period hereinafter referred to as the "Notice Period"), the Company agrees to continue in effect during the Notice Period the compensation and benefits to which Employee may be entitled under Section 3 of this Agreement. It is understood and agreed that at the expiration of the Notice Period, Employee's entitlement to such compensation and benefits shall cease except that in the event the Company terminates Employee's employment for reasons other than as set forth in Section 5.B above or by Employee for "Good Reason" (as defined below), or for no reason by the Company or Employee, the Company shall be obligated to pay to Employee Separation Pay; provided, however: (i) the payment of Separation Pay shall cease if Employee does not execute and deliver a general release in a form mutually acceptable to the Company and Employee ("Release") within thirty (30) days following delivery by the Company of the Release and the Release becomes effective and cannot be revoked; (ii) the Company's obligation to continue making payments of Separation Pay shall cease in the event Employee is in material breach of this Agreement; and (iii) the payment of Separation Pay shall be in lieu of and not in addition to any severance benefit that might otherwise be payable to the Employee under the terms of any severance plan or program of the Company applicable to employees of the Company. In no event shall the Employee be obligated to seek other employment or take any other action by way of mitigation of the Separation Pay and any Separation Pay shall not be reduced by compensation the Employee earns on account of employment with another employer.

As used herein, the term "Separation Pay" means the following: (i) equal installments of Base Salary payable in accordance with the Company's normal payroll practices which are in the aggregate equal to the Base Salary remaining payable until the end of the Contract Term, (ii) an amount equal to the Additional Compensation paid to Employee in the last twelve (12) months prior to the date of termination, payable in accordance with the Company's normal payroll practices for the payment of annual bonuses, (iii) if the Employee timely and properly elects health continuation coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), the Company shall reimburse the Employee for the employee portion of COBRA premiums on a monthly basis for the Employee and his dependents (if covered prior to the termination of employment) and/or reimbursement of premiums for comparable replacement health coverage until the end of the Contract Term. Company may, at its sole option, pay Separation Pay, or any portion thereof, in a lump sum at any time.

As used herein, the term "Good Reason" means (i) a relocation of the Employee's principal place of employment by more than 50 miles without the written consent of the Employee; or (ii) demotion of Employee to a position with responsibilities substantially less than Employee's duties as of the Effective Date without the prior written consent of Employee; (iii) an unacceptable change in Employee's immediate manager as set forth in Section 5B(g); or (iv) the Company's material breach of this Agreement or any material policy of the Company applicable to Employee. Employee shall only be deemed to terminate his employment with Good Reason pursuant to the foregoing definition if: (x) Employee gives to the Company written notice of his intent to terminate for Good Reason within thirty (30) days following the first occurrence of the condition(s) that Employee believes constitutes Good Reason, which notice shall describe such condition(s), (y) the Company fails to remedy such condition(s) within thirty (30) days following receipt of the written notice ("Cure Period"); and (z) Employee terminates his employment within thirty (30) days following the Cure Period.

E.   Employee agrees that during the Notice Period, he will cooperate fully with the Company in all matters relating to the winding up of any pending work and the orderly transfer to other Company employees of the accounts for which he has been most recently responsible. Employee further agrees that, during the Notice Period (whether or not active employment responsibilities continue during the Notice Period), Employee's duties to the Company, including Employee's fiduciary duty, shall remain in effect. Employee agrees that, prior to the expiration of the Notice Period, he will return to the Company all originals and hard copies of literature, correspondence, memoranda, reports, summaries, manuals, proposals, contracts and other documents of any kind which relate in any way to the business of the Company, including specifically all materials which comprise or refer to the Company's Confidential Information. It is understood and agreed that Employee will not retain any copy, facsimile or note intended to memorialize any such data. Employee further understands and agrees that, during or at the expiration of the Notice Period, and as part of his assigned job duties, he will reasonably participate in any meeting the Company may convene to: (i) review the status of accounts for which Employee has been most recently responsible or associated; (ii) ensure that Employee has fully obtained his entitlements under this Agreement and as provided by law; and/or (iii) confirm that Employee clearly understands the nature and scope of his post-employment obligations.

F.   As of the effective date of termination of Employee's employment for any reason, Employee agrees to execute all reasonable documents and things which the Company deems necessary and desirable to effect Employee's resignation as an officer or director of any company (if applicable) included within the definition of the Company as used in this Agreement.

G.   Employee agrees that, prior to the commencement of any new employment in any business providing Insurance Services or Benefit Services, Employee will furnish his prospective new employer

with a copy of this Agreement.  Employee also agrees that the Company may advise any prospective new employer of Employee of the existence and terms of this Agreement and furnish the prospective new employer with a copy of this Agreement.

H.    During the period of his employment with the Company, and after employment termination, Employee agrees to voluntarily make himself available to the Company and its legal counsel, at the Company's reasonable request without the necessity of obtaining a subpoena or court order, in connection with the Company's investigation, preparation, prosecution and/or defense of any actual or potential legal proceeding, regulatory action, or internal matter.  Employee agrees to provide any information reasonably within his recollection.  The Company will reimburse Employee for reasonable out-of-pocket expenses actually incurred as a result of such requests, or, at the Company's option, will arrange to advance Employee's reasonable expenses or incur such expenses directly.

I.    Employee agrees, that, while he is employed by the Company, and after the date of termination of his employment, he shall not make any false, defamatory or disparaging statements about the Company or the officers or directors of the Company that are reasonably likely to cause material damage to the Company or the officers or directors of the Company.

SECTION 6.    The Company's Right to Injunctive Relief; Attorneys' Fees.

Employee acknowledges that Employee's services to the Company are of a unique character which gives them a special value to the Company, the loss of which may not reasonably or adequately be compensated in damages in an action at law should he breach or threaten to breach his post-employment obligations under this Agreement.  Employee also acknowledges that it may be too difficult to measure precisely the damages to the Company from any breach by Employee of Sections 7 and/or 8 of this Agreement, that injury to the Company from any such breach may be incalculable and irremediable, and that money damages may therefore be an inadequate remedy for any such breach.  Accordingly, in addition to any other remedy which the Company may have at law or in equity, the Company may be entitled to enforce this Agreement and may be entitled to a temporary restraining order and preliminary and permanent injunctive relief to restrain any such breach or further breach by Employee.  Employee agrees that the Company will have the right to seek injunctive relief when and if it elects to do so and any delay in seeking injunctive relief will not prejudice or waive the Company's right to do so.

SECTION 7.    Trade Secrets and Confidential Information.

A.    Employee acknowledges that the Company's business depends to a significant degree upon the possession of information which is not generally known to others, and that the profitability of the Company's business requires that this information remain proprietary to the Company.  Accordingly:

(1)  Employee agrees that all intellectual property, such as computer programs, systems or software, developed during his employment or as a result of his employment is work for hire performed

by Employee in the scope of his employment. To the extent that any such intellectual property is determined not to constitute work for hire, or if any rights in any such intellectual property do not accrue to the Company as a work for hire, Employee's signature on this Agreement constitutes an assignment (without any further consideration) to the Company of any and all of his respective copyrights and other rights, title and interest in and to all such intellectual property. The Company shall retain all proprietary rights to any and all such intellectual property. Employee agrees to execute any documents necessary to perfect the Company's interest in such intellectual property upon the Company's request.

(2) Employee has been notified by the Company, and understands, that the foregoing provisions of Section 7.A(1) do not apply to an item of intellectual property for which no equipment, supplies, facilities or Confidential Information of the Company was used and which was developed entirely on Employee's own time, unless: (I) the item of intellectual property relates (A) to the business of the Company or (B) to the Company's actual or demonstrably anticipated research and development, or (II) the item of intellectual property results from any work performed by Employee for the Company.

B. Employee recognizes the highly sensitive nature of the Confidential Information he will be given and to which he will have access during his employment with the Company, and acknowledges the Company's legitimate interest in safeguarding such from disclosure. Accordingly, in addition to the restrictions provided in Section 8 below, Employee agrees that (i) after his employment with the Company is terminated, he will not divulge Confidential Information that constitutes a trade secret of the Company or make use of it for his own purpose or the purpose of another, and (ii) for a period of two years following the termination of his employment with the Company, he will not divulge Confidential Information that does not constitute a trade secret of the Company or make use of it for his own purpose or the purpose of another. Employee and the Company agree and acknowledge that not all of the Confidential Information will rise to the level of a trade secret of the Company, but nonetheless, all Confidential Information shall be entitled to the protections and restrictions provided in this Agreement. Employee further acknowledges that, notwithstanding the generality of prohibitions regarding the misuse or disclosure of Confidential Information, nothing in this Agreement prohibits Employee from reporting possible violations of federal law or regulation to any governmental agency or entity including, without limitation, the Department of Justice, the Securities and Exchange Commission, the Congress, and any agency Inspector General, or making other disclosures that are protected under the whistleblower provisions of federal law or regulation.

C. Employee understands and acknowledges that he will benefit significantly from having access to and being given Confidential Information and but for his agreements not to divulge such Confidential Information and the further restrictive covenants contained in Section 8 below, the Company would not agree to provide Employee with Confidential Information. Further, Employee acknowledges

that any breach by him of the restrictions provided in Section 8 below would inevitably and necessarily lead to the prohibited disclosure and/or use of Confidential Information.

D.   Notwithstanding the generality of the foregoing restrictions in this Section 7, Employee acknowledges having reviewed the Federal Defend Trade Secrets Act notice appearing in Section 2, above.

SECTION 8.        Protection of the Company's Protectable Interests.

In order to protect the goodwill and other assets being acquired in the Transaction as well as the legitimate interests of the Company in, among other things, protecting its Confidential Information, relationships with Company accounts, and related existing goodwill, and in consideration for, among other things as provided in this Agreement, the Company's promise to give Employee certain Confidential Information which Employee did not previously have and to enforce Employee's promise not to disclose such Confidential Information, Employee hereby agrees to the following restrictive covenants, which Employee acknowledges and agrees are reasonably necessary and narrowly tailored to protect the Company's legitimate business interests:

A.   For a period of two years (or 18 months if Employee is principally employed in the State of Oregon or the State of Alabama) following the termination of Employee's employment with the Company for any reason whatsoever, Employee will not, engage in providing Insurance Services or Benefit Services for:  (x) any Account of the Company for which Employee performed any of the foregoing functions during any part of the two-year period immediately preceding such termination (referred to hereinafter as "Protected Accounts"), or (y) any Prospective Account of the Company (as defined below). The term "Account of the Company" as used in this .paragraph shall be construed broadly to include all users of Insurance Services and/or Benefit Services including commercial and individual consumers, risk managers, carriers, agents and other insurance intermediaries who are customers of the Company on the date Employee's employment with the Company terminates, or an insurance  carrier offering a custom program for which the Company is a managing general agent, managing general underwriter, program manager or an underwriting agent, regardless of how the relationship is documented or characterized.  If an Account of the Company is part of a group of companies which conducts business through more than one entity, division or operating unit, whether or not separately incorporated (a "Client Group"), the term "Account of the Company" as used herein shall include products or services within any entity, division or operating unit of the Client Group where the same management group within the Client Group has the primary decision making authority with respect to contracting for services of the type rendered by the Company.

B.   For purposes of Section 8.A above, Employee agrees that direct or indirect solicitation of a Protected Account or Prospective Account shall expressly include, but not be limited to, the following

(which is not intended to be an exhaustive list of direct or indirect solicitation, but is meant to provide examples of certain reasonably anticipated scenarios):

(1)   The sending of an announcement by Employee or his new employer to any Protected Account or Prospective Account, the purpose of which is to communicate to the recipient that Employee has either formed his own business enterprise or joined an existing business enterprise that does or will perform Insurance Services and/or Benefit Services that in any way compete with the Company.

(2)   Initiating a communication or contact by Employee or his new employer with any Protected Account or Prospective Account for the purpose of notifying such Protected Account or Prospective Account that Employee has either formed his own business enterprise or joined an existing business enterprise that does or will perform Insurance Services and/or Benefit Services that in any way compete with the Company.

(3)   Employee's or his new employer's communication with any Protected Account or Prospective Account (if such new employer's communication with a Prospective Account was facilitated by Employee, directly or indirectly, or if Employee will or is intended to benefit, directly or indirectly, by such communication) if any such communication in any way relates to Insurance Services and/or Benefit Services; provided, however, nothing herein is intended to limit communications or contacts that are unrelated to Insurance Services and/or Benefit Services.

(4)   The facilitation by Employee, directly or indirectly, of any Protected Accounts' execution of a broker of record letter replacing the Company as its broker of record.

C.   Employee understands and agrees that many of the accounts for which he will perform Insurance Services and/or Benefit Services while employed by the Company are national accounts and that Employee will perform Insurance Services and/or Benefit Services for Company accounts throughout the entire country.   Employee agrees and acknowledges that the geographic scope relating to the restrictions provided in Section 8.A above shall include the entire United States and that since the post-employment restrictions herein provided are tied directly to Accounts of the Company for whom Employee performed Insurance Services and/or Benefit Services during the two-year period immediately preceding termination of his employment and Prospective Accounts, this geographic limitation is reasonable. Moreover, Employee acknowledges and agrees that the restrictions contained in Section 8.A do not prohibit Employee from competing with the Company or performing insurance or benefits services for potential clients throughout the entire world except for Protected Accounts and Prospective Accounts, and that those restrictions are reasonable and narrowly tailored to further the Company's legitimate interest to protect its Confidential Information, account relationships, and goodwill, and such restrictions will not unduly burden Employee's ability to earn a living after his employment with the Company is terminated.

D.   If, within two years of the termination of Employee's employment with the Company, Employee shall engage in, or join a company or business enterprise that is engaged in providing Insurance Services and/or Benefit Services, then in such event, Employee agrees that the Company may advise any Protected Account and/or Prospective Account of the existence and terms of this Agreement and furnish any and all such Protected Accounts and Prospective Accounts with a copy of this Agreement.

E.   Employee recognizes that employees of the Company are a valuable resource of the Company. Accordingly, during Employee's employment with the Company, Employee will not, directly or indirectly, solicit, induce or recruit any employee of the Company to leave the employ of the Company. In addition, for a period of two years following the termination of Employee's employment with the Company for any reason whatsoever, Employee will not directly or indirectly, solicit, induce or recruit any employee of the Company who has been provided Confidential Information to leave the employ of the Company.

F.   For the purposes of the covenants set forth in Sections 7 and 8 of this Agreement, the term "Prospective Account" of the Company, means any entity (other than a then-current account of the Company but including former Company accounts) with respect to whom, at any time during the one-year period preceding the termination of Employee's employment with the Company, Employee: (I) submitted or assisted in the submission of a presentation or proposal of any kind on behalf of the Company, (II) had material contact or acquired Confidential Information as a result of or in connection with Employee's employment with the Company, or (III) incurred travel and/or entertainment expenses which were reimbursed by the Company to Employee; but the term Prospective Account does not include an account that is a customer of Employee's new employer (for the same line of insurance business for which such customer was a Prospective Account of the Company) at the time of termination of Employee's employment with the Company. For the purposes of the covenants set forth in Sections 7 and 8 of this Agreement, the term "Company" shall include the Acquired Business.

SECTION 9.   Assignment.

Except as provided in Section 10 hereof, this Agreement shall not be affected by any merger or consolidation or other reorganization of the Company and this Agreement shall be assignable to and binding upon and shall inure to the benefit of the continuing entity or to any successor in interest to the Company, including without limitation, any entity to which the Company sells business, assets and/or accounts of any branch, business unit or profit center in which Employee is primarily employed. This Agreement also shall inure to the benefit of any and all affiliate companies included in the definition of the Company as used in this Agreement. In addition, the Company may assign this Agreement to any affiliate company of AJG, in which event: (i) such affiliate shall be the employer of Employee; and (ii)

except for purposes of Section 10 hereof, all references to "the Company" and all rights of the Company shall include and inure to the benefit of such employing affiliate.

This Agreement may not be assigned nor obligations hereunder delegated by Employee.

SECTION 10.    Release of Certain Obligations.

Notwithstanding anything contained herein to the contrary, the obligations of Employee contained in Section 8 shall become null and void and have no further effect immediately upon a Hostile Change in Control of AJG as defined herein. The Company shall send written notice to Employee within ten (10) days of a Hostile Change in Control of AJG, notifying Employee that such event has taken place. Failure of the Company to send such notice shall not preclude the release of Employee from the obligations contained in Section 8. For the purposes of this Section 10, the following definitions apply:

A.    The term "Hostile Change in Control" means a transaction, event or election constituting a Change in Control, which was not approved by, or, in an election, the directors elected were not nominated by, at least two-thirds of the members of the Board of Directors of AJG in office immediately prior to the Change in Control who have not died or become permanently disabled.

B.    The term "Change in Control" of AJG means and includes each and all of the following occurrences:

(1)    A Business Combination, unless:

a)    the Business Combination is approved or authorized by the affirmative vote of the holders of not less than 80% of the outstanding shares of voting stock of AJG and the affirmative vote of the holders of not less than 67% of the outstanding shares of the voting stock held by shareholders other than Related Persons; or

b)    the Continuing Directors of AJG by a two-thirds vote (i) have expressly approved in advance the acquisition of outstanding shares of voting stock of the corporation that caused the Related Person to become a Related Person, or (ii) have approved the Business Combination prior to the Related Person involved in the Business Combination having become a Related Person; or

c)    the Business Combination is solely between AJG and another corporation, 50% or more of the voting stock of which is owned by AJG and none of which is owned by the Related Person; or

d)    all of the following conditions are satisfied:

I.    The cash or fair market value of the property, securities or "other consideration to be received" per share by holders of common stock in AJG in the Business Combination is not less than the higher of:

     i) the highest per share price (including brokerage commissions, transfer taxes and soliciting dealers' fees) paid by the Related Person in acquiring any of its holdings of AJG's common stock, or

     ii) an amount that bears that same percentage relationship to the market price of AJG's common stock immediately prior to the announcement of such Business Combination as the highest per share price determined in i) above bears to the market price of AJG's common stock immediately prior to the commencement of the acquisition of AJG's voting stock that caused such Related Person to become a Related Person, or

     iii) an amount calculated by multiplying the earnings per share of AJG's common stock for the four fiscal quarters immediately preceding the record date for determination of stockholders entitled to vote on such Business Combination by the price/earnings multiple of the Related Person as of the record date as customarily computed and reported in the financial press.

    Appropriate adjustments shall be made with respect to i), ii) and iii) above for recapitalizations and for stock splits, stock dividends, and like distributions; and

    II. A timely mailing shall have been made to the stockholders of AJG containing in a prominent place (x) any recommendations as to the advisability (or inadvisability) of the Business Combination that the Continuing Directors or Outside Directors may choose to state, if there are at the time any such directors, and (y) the opinion of a reputable nationally recognized investment banking or financial services firm as to the fairness from the financial point of view of the terms of the Business Combination to the stockholders of AJG other than the Related Person (such firm to be engaged solely on behalf of such other stockholders, to be paid a reasonable fee for its services by AJG upon receipt of such opinion, to be a firm that has not previously been significantly associated with the Related Person and, if there are at the time any such directors, to be selected by a majority of the Continuing Directors and Outside Directors).

    (2) The acquisition of outstanding shares of AJG's voting stock that causes an individual, a corporation, partnership or other person or entity to become a Related Person.

    (3) Individuals who at the beginning of any period of three consecutive years constitute the entire Board of Directors of the Company shall for any reason other than death or permanent disability during such period cease to constitute a majority thereof.

    (4) A change in control of a nature that would be required to be reported in response to Item 6(e) of Schedule 14A of Regulation 14A promulgated under the Securities Act of 1934, as amended.

    C. The term "Business Combination" shall mean (i) any merger or consolidation of AJG with or into a Related Person, (ii) any sale, lease, exchange, transfer or other disposition, including without limitation a mortgage or any other security device, of all or any Substantial Part of the assets of the

Company to a Related Person, (iii) any merger or consolidation of a Related Person with or into AJG, (iv) any sale, lease, exchange, transfer or other disposition of all or any Substantial Part of the assets of a Related Person to the Company, (v) the issuance of any securities of the Company to a Related Person, (vi) the acquisition by the Company of any securities issued by a Related Person, (vii) any reclassification of securities, recapitalization or other transaction designed to decrease the number of holders of AJG's voting securities remaining, if there is a Related Person, and (viii) any agreement, contract or other arrangement providing for any of the transactions described in this definition of Business Combination.

D.   The term "Related Person" shall mean and include any individual, corporation, partnership or other person or entity which, together with their "Affiliates" and "Associates" (as defined as of November 1, 1983, in Rule 12b-2 under the Securities Exchange Act of 1934), "Beneficially Owns" (as defined as of November 1, 1983, in Rule 13d-3 under the Securities Exchange Act of 1934) in the aggregate 20% or more of the outstanding shares of the voting stock of AJG, and any Affiliate or Associate of any such individual, corporation, partnership or other person or entity; provided that Related Person shall not include any person who beneficially owned 20% or more of the outstanding shares of the voting stock of AJG on November 1, 1983. Without limitation, any shares of voting stock of AJG that any Related Person has the right to acquire pursuant to any agreement, or upon exercise of conversion rights, warrants or options, or otherwise, shall be deemed beneficially owned by the Related Person.

E.   The term "Substantial Part" shall mean more than 30% of the fair market value of the total assets of the corporation in question, as of the end of its most recent fiscal year ending prior to the time the determination is being made.

F.   The term "other consideration to be received" shall include, without limitation, capital stock of AJG retained by its existing public stockholders in the event of a Business Combination in which AJG is the surviving corporation.

G.   The term "Continuing Director" shall mean a director who was a member of the board of directors of AJG immediately prior to the time that the Related Person involved in a Business Combination became a Related Person, and the term "Outside Director" shall mean a director who is not (a) an officer or employee of AJG or any relative of an officer or employee or (b) a Related Person or an officer, director, employee, Associate or Affiliate of a Related Person, or a relative of any of the foregoing.

SECTION 11.   General.

A.   The captions in this Agreement are not part of its provisions, are merely for reference and have no force or effect. If any caption is inconsistent with any provision of this Agreement, such provision shall govern.

*EXECUTION VERSION*

B.   This Agreement is made in and shall be governed by and construed in accordance with the laws of the State of Delaware, unless such choice of law would violate the fundamental public policy of another state with a significant interest, in which event such state's substantive law will apply.   The parties agree that Delaware has a material and significant interest in questions concerning this Agreement and performance thereunder because, among other reasons, AJG is incorporated there and Delaware has a significant body of contract jurisprudence.   The parties agree that the sole and exclusive venue of any dispute between the parties with respect to this Agreement or any matters related thereto shall be a state, trial or federal district court located within the federal judicial district in which Employee resides (the "Chosen Venue").   Employee agrees that is not unfair nor unreasonable for the Chosen Venue to be selected as the exclusive venue for any dispute between the parties with respect to this Agreement or any matter related thereto and Employee will not suffer undue burden by having to litigate any such disputes in the Chosen Venue.   Moreover, Employee specifically covenants not to bring suit against the Company in any venue other than the above-selected exclusive Chosen Venue with respect to any dispute between the parties relating to this Agreement.   Employee waives and agrees not to interpose any argument that the Chosen Venue is an inconvenient forum for litigation.

**C.   Waiver of Jury Trial.   Because of the time and expense involved in the docketing of, preparation for and participation in a jury trial, the parties desire that any dispute arising hereunder will be decided by a judge rather than a jury.   Therefore, the parties hereby knowingly, voluntarily and intentionally waive the right either may have to a trial by jury in respect to any litigation based hereon, or arising out of, under or in conjunction with Employee's employment with Company, this Agreement, or any course of conduct, course of dealing, statement (whether verbal or written) or actions of either party.**

D.   This instrument contains the entire agreement of the parties and supersedes all other prior agreements, understandings, negotiations, correspondence, undertakings and communications of the parties, whether oral or written, relating to the employment of Employee by the Company.

E.   Subject to Section 11.F below, this Agreement may not be amended, altered, modified or superseded without the prior written consent of both parties, and such instrument shall expressly acknowledge that it is an amendment or modification of this Agreement.   Waiver of any term or condition of this Agreement shall not be construed as a waiver of any subsequent breach or failure of the same term or condition, or any other term or condition.   Any waiver must be in writing. No amendment, alteration, modification or waiver may be signed by Employee on behalf of the Company, its assignees, successors or assigns.

F.   To the extent that any of the terms set forth in this Agreement or any word, phrase, clause or sentence is found to be illegal or unenforceable for any reason, such word, phrase, clause or sentence shall

be modified or deleted by a court of competent jurisdiction so as to afford the Company the fullest protection commensurate with making this Agreement, as modified, legal and enforceable under applicable laws, and the balance of this Agreement shall not be affected thereby, the balance being construed as severable and independent.

     G.   All notices, requests, demands, claims and other communications hereunder shall be given in writing. Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient; (ii) one Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (iii) on the date sent by facsimile of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient, and (iv) four Business Days after being mailed to the recipient by certified or registered mail, return receipt requested, postage prepaid and addressed to the intended recipient as set forth below:

| | |
|---|---|
| COMPANY: | Arthur J. Gallagher & Co.<br>2850 Golf Road<br>Rolling Meadows, IL 60008<br>Attn: General Counsel |
| EMPLOYEE: | Employee's then current residence address as shown on the Company's records. |
| With a copy to (which shall not constitute notice): | Richard G. Satin Esq.<br>Schnader Harrison Segal & Lewis LLP<br>140 Broadway, Suite 1300<br>New York, NY 10005 |

or to such other addresses as the parties may hereafter designate to each other in writing.

     H.   The use of the male gender in this Agreement includes the female gender. The words "including" or "include" shall not be interpreted as terms of limitation or exclusion, and the singular includes the plural.

     I.   As used herein: (i) "Business Day" means any day except Saturday, Sunday or any other day on which commercial banks located in Chicago, Illinois are authorized or required by law to be closed for business; and (ii) "Dollars or $" means the lawful currency of the United States.

     J.   This Agreement may be executed in counterparts (including by means of facsimile, or other electronically scanned transmission), each of which shall be deemed an original copy. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

     K.   It is the intent of the parties that the payments and benefits under this Agreement comply with (or be exempt from the requirements of) Section 409A of the Code and the rulings and regulations

issued thereunder (collectively, "Section 409A") and, accordingly, to the maximum extent permitted, this Agreement shall be interpreted in accordance therewith. For purposes of Section 409A (including, without limitation, for purposes of Treasury Regulation Section 1.409A-2(b)(2)(iii)), the right to receive payments in the form of installment payments shall be treated as a right to receive a series of separate payments and, accordingly, each installment payment shall at all times be considered a separate and distinct payment. Whenever a payment under this Agreement may be paid within a specified period, the actual date of payment within the specified period shall be within the sole discretion of the Company. A termination of employment shall not be deemed to have occurred for purposes of any provision of this Agreement providing for the payment of any amounts or benefits that are considered "nonqualified deferred compensation" under Section 409A unless such termination is also a "separation from service" within the meaning of Section 409A and, for purposes of any such provision of this Agreement, references to a "termination," "termination of employment" or like terms shall mean "separation from service." In no event may Employee, directly or indirectly, designate the calendar year of payment. Notwithstanding the foregoing, in no event does the Company represent or warrant to Employee that the payments provided to Employee under this Agreement will not be subject to tax under Section 409A and in no event shall the Company or its affiliates or their respective officers, directors, employees or agents be liable for any additional tax, interest or penalties that may be imposed on Employee by Section 409A or damages for failing to comply with Section 409A.

*(Remainder of the page intentionally left blank; signatures on the following page)*

*EXECUTION VERSION*

IN WITNESS WHEREOF, the parties hereto have executed this Employment Agreement as of the Effective Date.

ARTHUR J. GALLAGHER & CO.,
on behalf of itself and its subsidiaries, divisions and
affiliated and related companies

By: _____
    Joel C. Kornreich, Vice President

EMPLOYEE _____

_____ 10-14-2019
Thomas Hartmann

```
FOR HR USE ONLY:

Employee ID:_____
```

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS Thomas Hartmann

**DEFENDANTS** Arthur J. Gallagher & CO.

**(b)** County of Residence of First Listed Plaintiff **Morris County**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   **New Castle**
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
*Gennet Kallmann Antin Sweetman & Nichols, P.C.*
*1 Gatehall Drive, Suite 300, Parsippany, New Jersey 07054*

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1   U.S. Government Plaintiff | ☐ 3   Federal Question *(U.S. Government Not a Party)* |
| ☐ 2   U.S. Government Defendant | ☒ Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                  *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & | ☐ 367 Health Care/ Pharmaceutical Personal Injury | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans | ☐ 340 Marine | Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | | ☐ 485 Telephone Consumer Protection Act |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 861 HIA (1395ff) ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 550 Civil Rights ☐ 555 Prison Condition ☐ 560 Civil Detainee - Conditions of Confinement | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 USC 1332 (a)(1)

Brief description of cause:  Breach of Employment Agreement

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $** Excess of $75k

CHECK YES only if demanded in complaint.
**JURY DEMAND:**   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*       JUDGE _____       DOCKET NUMBER _____

DATE _____      SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

JS 44 Reverse (Rev. 04/21)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**    **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

  **(b)**    **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

  **(c)**    **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**    **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.**    **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**    **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**    **Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.**    **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.**    **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**    **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

AO 440 (Rev. 12/09)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

District of New Jersey

| | |
|---|---|
| THOMAS HARTMANN | )<br>) |
| *Plaintiff* | )<br>) |
| v. | )   Civil Action No. |
| ARTHUR J. GALLAGHER & CO. | )<br>) |
| *Defendant* | ) |

### SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   ARTHUR J. GALLAGHER & CO.
C/O REGISTERED AGENT CORPORATION SERVICE COMPANY
2711 CENTERVILLE ROAD, SUITE 400
WILMINGTON, DELAWARE 19808


A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

GENNET KALLMANN ANTIN SWEETMAN & NICHOLS, P.C.
STANLEY W. KALLMANN, ESQ.
1 GATEHALL DRIVE, SUITE 300
PARSIPPANY, NEW JERSEY 07054


If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.


*CLERK OF COURT*


Date:   _____09/20/2021_____          _____
                                          Mathew T. Walsh
                                          *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 12/09)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❑  I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❑  I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑  I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❑  I returned the summons unexecuted because _____ ; or

❑  Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.


Date: _____              _____
                                                        *Server's signature*

                                               _____
                                                        *Printed name and title*


                                               _____
                                                        *Server's address*

Additional information regarding attempted service, etc: