**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| THOMAS HARTMANN, <br><br> Plaintiff, <br><br> v. <br><br> ARTHUR J. GALLAGHER & CO., <br><br> Defendant. | Civil Action No. 21-17241 <br><br> **OPINION** <br><br> September 23, 2024 |

**SEMPER**, District Judge.

Before the Court are two motions for summary judgment: Plaintiff Thomas Hartmann's ("Plaintiff" or "Hartmann") partial motion for summary judgment on liability only (ECF 44) and Defendant Arthur J. Gallagher & Co.'s ("Defendant" or "Gallagher") motion for summary judgment (ECF 46). The Court has decided the motions upon the parties' submissions, without oral argument, pursuant to Federal Rule of Civil Procedure 78 and Local Rule 78.1. For the reasons set forth below, Defendant's motion for summary judgment (ECF 46) is **DENIED**, and Plaintiff's partial motion for summary judgment (ECF 44) is **GRANTED**.

**I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]**

This breach of contract case arises from the end of an employment relationship between Plaintiff and Defendant Gallagher. Gallagher is a global insurance brokerage and risk management

---

[1] The facts and procedural history are drawn from the Amended Complaint (ECF 15), the parties' submissions regarding undisputed material facts (ECF 46-2, Defendant's Statement of Undisputed Material Facts ("DSMF"); ECF 44-12, Plaintiff's Statement of Undisputed Material Facts, ("PSMF"); ECF 49-2, Defendant's Counterstatement to PSMF ("DCSMF"); and ECF 48, Plaintiff's Counterstatement to DSMF ("PCSMF")), and the parties' briefs.

services firm. (DSMF ¶ 1.)[2] In 2019, Gallagher acquired the company that employed Plaintiff. (*Id.* ¶ 19.) Plaintiff worked for Gallagher from 2019 until 2021, when Plaintiff resigned. (*Id.* ¶¶ 22, 64.) Plaintiff asserts that pursuant to his employment contract with Gallagher, he is entitled to separation pay. (ECF 15.) Gallagher disagrees. (ECF 16.)

### A. Plaintiff, Carras, and RPA/ICC

In December 2016, Plaintiff was hired by Dean Carras to supervise the operations of Innovative Coverage Concepts, LLC ("ICC"). (DSMF ¶¶ 10-11.) Carras owned RPA Insurance Services, LLC ("RPA") and ICC (collectively "RPA/ICC"). (*Id.* ¶ 4.)[3] RPA was a retail insurance agency/brokerage. (*Id.* ¶ 5.) ICC was a managing general agent ("MGA").[4] (*Id.* ¶ 6.) Both RPA and ICC focused on insurance coverage for restaurants, bars, and taverns. (*Id.* ¶ 9.) Plaintiff managed ICC's day-to-day operations, but Carras remained the final decisionmaker regarding all ICC matters. (*Id.* ¶ 14.) Plaintiff did not have an ownership interest in RPA/ICC. (*Id.* ¶ 12.)

Plaintiff was employed by ICC when Carras and Gallagher began discussing Gallagher's potential acquisition of RPA/ICC in 2019. (*Id.* ¶ 15.) About three weeks to a month before the deal closed between RPA/ICC and Gallagher, Plaintiff learned of the potential acquisition. (*Id.*) He understood that upon the acquisition, ICC would merge into Gallagher's Risk Placement Services ("RPS") business run by Christopher Leisz ("Leisz"). (*Id.*) Plaintiff allegedly told Leisz that he would consider staying with ICC once he received a contract. (*Id.* ¶ 17.) While Defendant asserts

---

[2] Through Gallagher's subsidiary, Arthur J. Gallagher Risk Management Services, Inc. ("AJGRMS"), Gallagher provides Property/Casualty insurance brokerage services in the United States. (DSMF ¶ 2.)
[3] In 2001 and 2004, Carras founded ICC and RPA, respectively. (DSMF ¶ 5.)
[4] An MGA is provided underwriting rights by an insurance carrier and is allowed to control a class of business offered by the insurance carrier. (DSMF ¶ 7.) Within a set of underlying guidelines established by the insurance carrier, the MGA can underwrite and issue the policies to insurance brokers and agents. (*Id.*) The MGA never dealt with the insured. (*Id.*) ICC acted as an intermediary in connection with certain "wholesale" business. (*Id.* ¶ 8.) In that circumstance, ICC would receive and forward to the insurance carrier a submission from a retail broker. (*Id.*) The insurance carrier would quote and underwrite the business. (*Id.*) ICC would then forward the insurance carrier's quote to the retail broker. (*Id.*)

2

that prior to the acquisition, Plaintiff had not received offers of employment from any other entities, Plaintiff asserts that this statement is misleading because it fails to discuss the other business opportunities Plaintiff had at the time of the acquisition or his desire to continue working with Carras. (PCSMF ¶ 17.) Prior to the closing, Plaintiff was not informed of what Carras' role with Gallagher would be post-acquisition. (DSMF ¶ 18.) Plaintiff understood Leisz would run the business, and he assumed he would still report to both Carras and Leisz, with an "indirect" reporting relationship with Leisz. (*Id.*)

### B. Gallagher's Acquisition

On May 16, 2019, Gallagher acquired RPA/ICC and onboarded it into Gallagher's RPS business. (*Id.* ¶ 19.) Plaintiff described this transition as difficult since he reported to and received conflicting instructions from both Leisz and Carras. (*Id.* ¶ 20.) Both Leisz and Carras directed strong words toward Plaintiff. (*Id.*) There were minimal discussions with Plaintiff about an employment contract. (*Id.* ¶ 21.) Leisz apologized for the delay and told Plaintiff, "he was working on it" and that such contracts were typically handled prior to a deal's closing. (*Id.*) Plaintiff did not communicate contract demands to Leisz. (*Id.*)

Within three to six weeks, RPA/ICC was re-onboarded into Daniel Tropp's business. (*Id.* ¶ 22.) Tropp was the Regional Vice President for the Mid-Atlantic Region of "GGB US." (*Id.*) At the time of re-onboarding, Plaintiff was reporting to Carras. (*Id.*)

Before the acquisition and during onboarding, Plaintiff did not demand that any specific contract terms be included in his employment contract. (*Id.* ¶ 23.) Before receiving the initial draft of the contract, Plaintiff had no discussions with Carras about proposed contractual terms. (*Id.*) On or around June 7, 2019, Carras reviewed draft agreements for several employees who worked for RPA/ICC prior to Gallagher's acquisition. (*Id.* ¶ 24.) Carras sent Tropp an email identifying

recommended changes for each employee's agreement. (*Id.*) With respect to the draft agreement for Plaintiff, Carras recommended: deleting a "Whereas" clause that indicated Plaintiff was an equity owner in RPA/ICC; clarifying Plaintiff's role within ICC; and expanding Plaintiff's bonus entitlement based on ICC's net revenue performance. (*Id.*) There was no reference to modifying the circumstances that would trigger Separation Pay. (*Id.*)

### C. The Employment Agreement

On or about June 13, 2019, Gallagher provided Plaintiff with a draft employment agreement ("Draft Agreement"). (*Id.* ¶ 25.) Section 5A granted each party the right to terminate the relationship upon 45 days' written notice to the other. (*Id.*) Section 5B defined eight specific circumstances that could constitute "Cause" for Plaintiff's termination. (*Id.*) Three of these reasons could be "cured" by Plaintiff following 30 days' written notice from Gallagher. (*Id.*) Pursuant to Section 5C, if Plaintiff's employment was terminated for Cause, any compensation or benefits would immediately cease. (*Id.*) Section 5D of the draft Agreement contained the following language regarding the circumstances that would entitle Plaintiff to Separation Pay:

> It is understood and agreed that at the expiration of the Notice Period, Employee's entitlement to such compensation and benefits shall cease except that in the event the Company terminates Employee's employment for reasons other than as set forth in Section 5B above or by Employee for "Good Reason" (as defined below), or for no reason, the Company shall be obligated to pay to Employee Separation Pay . . .

(*Id.* ¶ 26.) Good Reason was defined as follows:

> As used herein, the term "Good Reason" means (i) a relocation of the Employee's principal place of employment by more than 50 miles without written consent of the Employee; or (ii) demotion of Employee to a position with responsibilities substantially less than Employee's duties as of the Effective Date without the prior written consent of employee; or (iii) the Company's material breach of this Agreement or any material policy of the Company applicable to the Employee.

4

(*Id.* ¶ 27.) To trigger a termination for Good Reason, Plaintiff was required to do the following:

> Employee shall only be deemed to terminate his employment with Good Reason pursuant to the foregoing definition if: (x) Employee gives to the Company written notice of his intent to terminate for Good reason within thirty days (30) days following the first occurrence of the condition(s) that Employee believes constitutes Good Reason, which notice shall describe such conditions(s), (y) the Company fails to remedy such conditions within thirty (30) days following receipt of the written notice "Cure Period"); and (z) Employee terminates his employment within thirty (30) days following the Cure Period.

(*Id.* ¶ 28.) Section 5D of the Draft Agreement defined "Separation Pay" as follows:

> (i) equal installments of Base Salary payable in accordance with the Company's normal payroll practices which are in the aggregate equal to the Base Salary remaining payable until the end of the Contract term, (ii) an amount equal to the Additional Compensation paid to the Employee in the last twelve (12) months prior to the date of termination, payable in accordance with the Company's payroll practices for the payment of annual bonuses, (iii) if the Employee timely and properly elects health continuation coverage under [COBRA], the Company shall reimburse the Employee for the employee portion of COBRA premiums on a monthly basis for the Employee and his dependents (if covered prior to the termination of employment) and/or reimbursement of premiums for comparable replacement health coverage until the end of the Contract Term. Company may, at its sole option, pay Separation Pay, or any portion thereof, in a lump sum at any time.

(*Id.* ¶ 29.) On July 22, 2019, Plaintiff sent Carras an email proposing six modifications to the Draft Agreement. (*Id.* ¶ 30.) Prior to this email, Plaintiff did not speak with Carras or any other Gallagher employee about the Draft Agreement or its terms. (*Id.*) Plaintiff's six proposed modifications were as follows:

1) Section 1 – Employment and Term – I would like the ending date modified to July 31, 2022.

2) Section 3B – Base Revenues – The Base Revenue figure for the purpose of bonuses must be include [sic].

3) Section 3D – Vacations – Be amended to provide four (4) weeks of paid vacation.

5

4) Section 5B(g) – Deleted in its entirety until such time I am provide [sic] with a detailed description of my duties and the identity of my immediate manager. Once received and agreed upon the following wording must be added to Section 5B(g). "The employee must be provided 30 day written notice by the company of any changes to the employees immediate manager and if the employee is not agreeable to such change it would be considered " Good Reason" per Section 5D.

5) Section 5D – "or no Reason" Be amended to read "or no reason by the company or employee"

6) Section 8G should be added to provide as follows: "Notwithstanding any provision to the contrary in this Agreement, if the Employee shall be subject to any restrictive covenant of employment for two (2) years as stated in Section 8A, the Company shall be required to compensate the Employee as provided in Section 3 hereof.

(*Id.*) Plaintiff testified that he did not consider these items "requests" and believed that all matters were "open to negotiation." (*Id.* ¶ 31.)

Regarding Plaintiff's proposed revisions to Section 5D's "no reason" language, Plaintiff testified that he sought the modification "[t]o make perfectly clear that either the company or myself can resign for no reason. They put it in there, 'for no reason.'" (*Id.* ¶ 35.) He further testified "I wanted to make sure 'no reason' meant just that. And if I had the ability to let me go for no reason. And that was discussed and agreed to." (*Id.*) In response to a question that "either the company or the employee could resign?" Plaintiff responded, "Yeah. For no reason – for no reason by the company or the employee. Can resign for no reason and be entitled to separation pay as per the contract." (*Id.* ¶ 36.)

From July 22, 2019 to the day the final employment agreement was signed, Plaintiff did not speak to Carras about the Draft Agreement. (*Id.* ¶ 38.) Tropp was the only Gallagher employee Plaintiff spoke to about his discussion points. (*Id.* ¶ 39.) Plaintiff does not recall the first time he spoke to Tropp about the status of the Draft Agreement. (*Id.* ¶ 40.) However, on August 27, 2019,

6

Plaintiff emailed Tropp the July 22nd email that Plaintiff had sent to Carras. (*Id.*) That email referenced a verbal conversation between Plaintiff and Tropp from that day. (*Id.*) Plaintiff stated he and Tropp did not discuss any of the Draft Agreement's terms during this conversation. (*Id.*) Plaintiff did not recall having any conversation about the Draft Agreement with Tropp between August 27, 2019 and sometime in early October 2019. (*Id.* ¶ 41.) When they did speak, Tropp testified that Plaintiff primarily focused on the Section 8A non-solicitation provision. (*Id.*) Plaintiff said that they talked about the changes he wanted to make in the contract. (*Id.*) Plaintiff testified that he recalled talking to Tropp over the phone and discussing what the "no reason" clause meant, but he could not recall specifics of the conversation. (*Id.*)

On October 3, 2019, Tropp forwarded the July 22 email to Kerry Abbott, in-house counsel at Gallagher who was involved in the drafting of employment agreements related to the RPA/ICC acquisition. (*Id.* ¶ 42.) Tropp told Abbott that he had agreed to modify the Good Reason language in the context of an unacceptable change in Plaintiff's immediate manager. (*Id.*) They did not discuss Plaintiff's request that he be able to resign for no reason and receive Separation Pay. (*Id.*) With respect to the requested change to Section 5D, Tropp testified that he did not know what the proposed language meant. (*Id.*) Plaintiff did not advise Tropp that he was seeking a term for Separation Pay if he walked away from Gallagher for no reason. (*Id.* ¶ 43.) Abbott reviewed the July 22nd email and, on October 4, 2019, advised Tropp that it was unacceptable to agree to pay Plaintiff for the two-year non-solicitation period. (*Id.* ¶ 44.)

As a result of negotiations, the parties executed an Employment Agreement on October 14, 2019. (PMSJ at 5; ECF 44-3, Ex. B.) Section 5D of the Employment Agreement provides:

> In the case of termination of Employee's employment with the Company . . . . in the event the Company terminates Employee's employment for reasons other than as set forth in Section 5.B above or by Employee for "Good Reason" (as defined below), or for no

> reason by the Company or Employee, the Company shall be obligated to pay to Employee Separation Pay; provided, however: (1) the payment of Separation Pay shall cease if Employee does not execute and deliver a general release in a form mutually acceptable to the Company and Employee ("Release") within thirty (30) days following delivery by the Company of the Release and the Release becomes effective and cannot be revoked; (ii) the Company's obligation to continue making payments of Separation Pay shall cease in the event Employee is in material breach of this Agreement; and (iii) the payment of Separation Pay shall be in lieu of and not in addition to any severance benefit that might otherwise be payable to the Employee under the terms of any severance plan or program of the Company applicable to employees of the Company. In no event shall the Employee be obligated to seek other employment or take any other action by way of mitigation of the Separation Pay and any Separation Pay shall not be reduced by compensation the Employee earns on account of employment with another employer.

(ECF 44-3, Ex. B, Section 5D.) Separation Pay is defined as:

> (i) equal installments of Base Salary payable in accordance with the Company's normal payroll practices which are in the aggregate equal to the Base Salary remaining payable until the end of the Contract Term, (ii) an amount equal to the Additional Compensation paid to Employee in the last twelve (12) months prior to the date of termination, payable in accordance with the Company's normal payroll practices for the payment of annual bonuses, (iii) if the Employee timely and property elects health continuation overage under the Consolidated Omnibus Reconciliation Act of 1985 ("COBRA"), the Company shall reimburse the Employee for the employee portion of COBRA premiums on a monthly basis for the Employee and his dependents (if covered prior to the termination of employment) and/or reimbursement of premiums for comparable replacement health coverage until the end of the Contract Term. Company may, at its sole option, pay Separation Pay, or any portion thereof, in a lump sum at any time.

(*Id.*) Good Reason is defined as:

> (i) a relocation of the Employee's principal place of employment by more than 50 miles without the written consent of the Employee; or (ii) demotion of Employee to a position with responsibilities, substantially less than Employee's duties as of the Effective Date without the prior written consent of Employee; (iii) an unacceptable change in Employee's immediate manager as set forth in Section 5B(g); or (iv) the Company's material breach of this Agreement or any material policy of the Company applicable to Employee.

8

> Employee shall only be deemed to terminate his employment with Good Reason pursuant to the foregoing definition if: (x) Employee gives to the Company, written notice of his intent to terminate for Good Reason within thirty (30) days following the first occurrence of the condition(s) that Employee believes constitutes Good Reason, which notice shall describe such condition(s), (y) the Company fails to remedy such condition(s) within thirty (30) days following receipt of the written note ("Cure Period"); and (z) Employee terminates his employment within thirty (30) days following the Cure Period.

(*Id.*)

### D. Plaintiff's Departure from Gallagher

The COVID-19 pandemic materially and negatively impacted ICC's business model. (*Id.* ¶ 48.) ICC's clients sought modification to the insurance premiums due during this period because restaurants, bars, and taverns were materially impacted by the COVID-19 stay-at-home order. (*Id.*) Because the ICC business was struggling, in or around March 2021, Gallagher started to evaluate what to do with ICC and considered shutting it down or moving it into Gallagher's SELECT business. (*Id.* ¶ 49.) The SELECT business was run by Christopher Mangum ("Mangum"). (*Id.*) If the ICC program was moved to Mangum's business, Hartmann would likely report to Mangum. (*Id.*)

On May 10, 2021, Plaintiff received an email from Tropp about relaunching the restaurant programs. (*Id.* ¶ 50.) Mangum began to evaluate whether he could turn the business around. (*Id.*) He had his first due diligence communications with Plaintiff about ICC's operations on May 13, 2021. (*Id.*) In a follow up email to Mangum, Plaintiff represented that he was excited to share more details about the business. (*Id.*)

On May 20, 2021, Mangum, Plaintiff, and Romano Gadia, an ICC operations employee, participated in a call to discuss ICC's business. (*Id.* ¶ 51.) Plaintiff confirmed that he got along fine with Mangum. (*Id.*) Plaintiff believed that Carras was involved in calls with Mangum. (*Id.*) In late May 2021, Mangum, Tropp, and Kristina Winterfeldt, Area President, discussed an eventual

9

transition of the ICC business under the umbrella of Mangum's business. (*Id.* ¶ 52.) On or about June 9, 2021, Mangum advised Plaintiff that he would begin reporting to Mangum beginning July 1, 2021. (*Id.* ¶ 53.)

At some point in mid-June 2021, Tropp and Winterfeldt called Plaintiff to advise him that the business would be transitioned to the SELECT organization, and Carras would no longer be involved. (*Id.* ¶ 54.) Defendant asserts that no official manager change had been made as the business had not yet been transferred. (*Id.*)

On June 22, 2021, Tropp and Carras met with Plaintiff to discuss the transition. (*Id.* ¶ 55.) Plaintiff came to the meeting and presented a written resignation letter. (*Id.*) The letter states:

> Please accept this termination of employment pursuant to Section 5A wherein "either party shall have a right to terminate employment with the company at any time upon forty-five (45) days' written notice to the other party."
>
> The basis for said termination includes but is not limited to the following:
> 1) Section 5D(iv), the company's material breach by failing to provide Employee "written notice" of change of manager;
> 2) An unacceptable change in Employee's immediate manager (see Section 5D(iii)) as set forth in Section 5B(g); and
> 3) For no reason by the Employee as provided in Section 5D.
>
> Accordingly, pursuant to Section 5D, I shall be entitled to my "Separation Pay" as defined in the Employment Agreement remaining payable until the end of my contract term (October 31, 2024) which is provided in Section 1.

(ECF 44-4, Ex. C.) Plaintiff testified that based on the discussion during the June 22 meeting with Tropp and Carras, "there was no definitive conclusion as to what [Carras'] role may or may not be." (*Id.*) Moreover, Plaintiff said that he would be willing to reconsider if he could get comfortable with Mangum. (*Id.*)

The next day, Mangum spoke with Carras and Plaintiff about the business and coming to Tulsa, Oklahoma to meet his team. (*Id.* ¶ 56.) Plaintiff responded "[g]reat call this afternoon, let

10

me get with Dean on this tomorrow and we'll get back to you." (*Id.*) During the week of July 19, 2021, Plaintiff and Carras travelled to Tulsa, Oklahoma to meet Mangum and his team in person. (*Id.* ¶ 57.) Plaintiff spent three or four full days in Tulsa, while Carras spent one day. (*Id.*)

The week after Plaintiff and Carras' Tulsa visit, Mangum and Plaintiff had a telephone conversation and discussed concerns that Plaintiff had moving forward. (*Id.* ¶ 58.) On July 29, 2021, Mangum sent Plaintiff an email identifying the concerns Plaintiff articulated during their call. (*Id.*) The three concerns Plaintiff articulated related to his own compensation, his team's compensation, and a Chubb underwriter's move to another client and the impact that might have on his relationship with the client. (*Id.*) Mangum requested, and Plaintiff agreed, to extend any decision to resign for 30 days so that Mangum could resolve Plaintiff's issues. (*Id.* ¶ 59.) The extension ran through August 30, 2021. (*Id.*)

On August 12, 2021, Mangum and Plaintiff had a call, during which he provided Plaintiff with an update on the issues and other operational problems. (*Id.* ¶ 60.) Chubb notified Gallagher that it did not intend to renew its agreement with ICC, and Plaintiff's colleague, Mr. Gadia, resigned his employment. (*Id.*)

During a phone call on August 25, 2021, Plaintiff advised Mangum that he intended to resign effective September 3, 2021 because he deemed reporting to Mangum to be unacceptable. (*Id.* ¶ 62.) In an email dated August 25, 2021 from Mangum to Plaintiff, Mangum wrote:

> We have received your verbal notice of your intent to resign on September 3rd based on the clause in your contract that reporting to me would be an unacceptable manager change. While we do not agree that this would be an unacceptable change in managers, we will nevertheless leave you directly reporting to Dean as you always have. [Please note that there was never an official change of your reporting structure and any discussions thus far have been preliminary.] We consider this matter closed and look forward to your ongoing employment with Gallagher.

11

(ECF 46-4, Ex. Q.) Plaintiff nevertheless resigned. (DSMF ¶ 64.) Plaintiff asserts that he did not accept Defendant's attempt to cure because when he called Carras to inform him that he would be reporting to him, Carras responded "What do you mean?" and that he had nothing for Plaintiff to do. (PCSMF ¶ 64.)

On September 21, 2021, Plaintiff initiated this action. (ECF 1.) Plaintiff's Amended Complaint asserts one claim for breach of contract against Gallagher for failure to provide him with Separation Pay pursuant to the Employment Agreement. (ECF 15.)

## II.     LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted if the movant shows that "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cnty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Peters v. Del. River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994)). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A fact is only "material" for

purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Unsupported allegations, subjective beliefs, or argument alone, however, cannot forestall summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1988) (nonmoving party may not successfully oppose summary judgment motion by simply replacing "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."). Thus, if the nonmoving party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23). Moreover, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48.

When, as here, the parties file dueling motions for summary judgment, the governing standard "does not change." *Auto-Owners Ins. Co. v. Stevens & Ricci, Inc.*, 835 F.3d 388, 401 (3d Cir. 2016) (citing *Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987)). The court must consider the motions independently, in accordance with the principles outlined above. *Goldwell of N.J., Inc. v. KPSS, Inc.*, 622 F. Supp. 2d 168, 184 (D.N.J. 2009); *Williams v. Phila. Housing Auth.*, 834 F. Supp. 794, 797 (E.D. Pa. 1993), *aff'd*, 27 F.3d 560 (3d Cir. 1994). "That one of the cross-motions is denied does not imply that the other must be granted." *Indus. Corner Corp. v. Pub. Serv. Mut. Ins. Co.*, No. 20-06677, 2023 U.S. Dist. LEXIS 22017, at *14 (D.N.J. Feb. 8, 2023). For each

13

motion, "the court construes facts and draws inferences in favor of the party against whom the motion under consideration is made" but does not "weigh the evidence or make credibility determinations" because "these tasks are left for the fact-finder." *Pichler v. UNITE*, 542 F.3d 380, 386 (3d Cir. 2008) (internal quotation and citations omitted).

### III.  ANALYSIS

The Employment Agreement, the contract at issue here, contains a Delaware choice of law provision. (ECF 44-3, Ex. B.) Accordingly, the Court will apply Delaware law in analyzing Plaintiff's breach of contract claim. "Under Delaware law, plaintiffs must establish the following three elements to succeed on a breach of contract claim: (1) the existence of a contract, whether express or implied; (2) breach of one or more of the contract's obligations; and (3) damages resulting from the breach." *Geico Gen. Ins. Co. v. Green*, 308 A.3d 132, 140 (Del. 2022).

#### A.  Defendant's Motion for Summary Judgment

Defendant sets forth several arguments as to why Plaintiff's breach of contract claim fails. The Court addresses each argument in turn.

##### 1.  Whether Defendant Cured Plaintiff's "Good Reason" for Resigning

Defendant first argues that Plaintiff's breach of contract claim fails since he did not properly resign for Good Reason because Defendant cured the basis for his resignation. (DMSJ at 23-24.) In his resignation letter, Plaintiff wrote he was resigning, in part, due to "[a]n unacceptable change in Employee's immediate manager (see Section 5D(iii)) as set forth in Section 5B(g)[.]" (ECF 44-4, Ex. C.) Plaintiff apparently re-communicated this basis for resignation again in a phone call to Mangum on August 25, 2021. (DSMF ¶ 62.) Defendant argues it cured this basis for resignation. Specifically, in an August 25, 2021 email from Mangum to Plaintiff, Mangum wrote:

> We have received your verbal notice of your intent to resign on September 3rd based on the clause in your contract that reporting to

14

> me would be an unacceptable manager change. While we do not agree that this would be an unacceptable change in managers, we will nevertheless leave you directly reporting to Dean as you always have. [Please note that there was never an official change of your reporting structure and any discussions thus far have been preliminary.] We consider this matter closed and look forward to your ongoing employment with Gallagher.

(ECF 46-4, Ex. Q.) Plaintiff disputes that Defendant cured the basis for his resignation. Plaintiff asserts that when he called Carras to inform him that Plaintiff would be reporting to him, Carras responded "What do you mean?" and stated that he had nothing for Plaintiff to do. (PCSMF ¶ 64.) Plaintiff asserts that this established Defendant did not cure the unacceptable change. Because disputed issues of material fact exist regarding whether Defendant cured this reason for Plaintiff's resignation, the Court declines to grant summary judgment on this basis. *See, e.g.*, *Villare v. Beebe Med. Ctr., Inc.*, No. 05C-10-023, 2008 Del. Super. LEXIS 538, at *10 (Del. Super. Ct. Mar. 11, 2008) ("Whether plaintiff, in fact, cured or attempted to cure in accordance with the agreement and the law is a determination based on disputed facts. As such, summary judgment is not appropriate.").

### 2. Meeting of the Minds as to "No Reason"

Defendant next argues there was no meeting of the minds as to the "no reason" language in the Employment Agreement and reading the contract otherwise would lead to an absurd result. (DMSJ at 30.)

In construing a contract, Delaware courts endeavor to give effect to the intent of the parties. *Weinberg v. Waystar, Inc.*, 294 A.3d 1039, 1044 (Del. 2023). Delaware adheres to the "objective" theory of contracts, such that a contract's construction should be that which would be understood by an objective, reasonable third party. *Id.* Delaware courts read the contract as a whole and enforce the plain meaning of clear and unambiguous language. *Id.* In doing so, Delaware courts aim to give each provision and term effect and not render any terms meaningless or illusory. *Id.*

"Moreover, '[i]n giving sensible life to a real-world contract, courts must read the specific provisions of the contract in light of the entire contract.'" *Id.* (quoting *Chicago Bridge & Iron Co. N.V. v. Westinghouse Electric Co. LLC*, 166 A.3d 912, 913-14 (Del. 2017)). Where language is unambiguous, courts "will give effect to the plain meaning of the contract's terms and provisions." *Weinberg*, 294 A.3d at 1044 (quoting *Manti Holdings, LLC v. Authentix Acquisition Co.*, 261 A.3d 1199, 1208 (Del. 2021)).

"Language is ambiguous if it is susceptible to more than one reasonable interpretation." *Weinberg*, 294 A.3d at 1044 (quoting *Manti Holdings*, 261 A.3d at 1208). "An interpretation is unreasonable if it 'produces an absurd result' or a result 'that no reasonable person would have accepted when entering the contract.'" *Weinberg*, 294 A.3d at 1044 (quoting *Manti Holdings*, 261 A.3d at 1208). If parties disagree over interpretation, that alone will not render the contract ambiguous. *Weinberg*, 294 A.3d at 1044. Furthermore, the determination of ambiguity lies within the sole province of the court. *Id.*

Section 5D of the Employment Agreement provides "in the event the Company terminates Employee's employment for reasons other than as set forth in Section 5.B above or by Employee for 'Good Reason' (as defined below), or for <u>no reason</u> by the Company or Employee, the Company shall be obligated to pay to Employee Separation Pay[.]" (ECF 44-3, Ex. B (emphasis added).) The term "no reason" is not ambiguous. Here, "no reason" means that neither Plaintiff nor Defendant had to provide a reason or basis for the termination of the employment relationship. Moreover, Defendant does not offer another reasonable interpretation of the phrase "no reason." Instead, Defendant argues that the no reason language renders the "Good Reason" resignation provision a nullity. The Court disagrees. The Good Reason language delineates several bases upon which only Plaintiff could resign from his employment, while the no reason provision provides

16

that Defendant *or* Plaintiff could terminate the employment relationship for no reason at all. The no reason language does not render the Good Reason language meaningless. Defendant also argues that enforcement of the no reason provision would allow Plaintiff to resign for no reason and receive Separation Pay, which Defendant argues is an absurd result. However, that is the language Defendant agreed to, and receipt of some form of severance upon termination of an employment relationship is not an absurd result. Accordingly, Defendant's argument that there was no meeting of the minds as to this contractual provision fails.

### 3. Specific vs. General Language

Defendant next argues that because the Good Reason and no reason provisions conflict with each other, only the Good Reason provision can be enforced. Delaware courts generally enforce specific contract provisions over general contract provisions when specific and general provisions conflict. *Reybold Venture Grp. XVI LLC v. Cresswell*, No. N10C-05-078, 2014 WL 7010757, at *5 (Del. Super. Ct. Nov. 26, 2014), *aff'd*, 115 A.3d 1215 (Del. 2015). Here, however, the Good Reason and no reason provisions are not in conflict. Rather, each provision provides mechanisms for the termination of the employment relationship. Pursuant to Section 5D, Plaintiff could terminate the relationship for Good Reason or no reason, and Defendant could terminate for no reason.[5] As stated in his letter, Plaintiff's resignation from the Company was for *both* Good Reason and no reason. (ECF 44-4, Ex. C.) Accordingly, the Court declines to grant summary judgment to Defendant on this basis, and Defendant's motion for summary judgment is **DENIED**.

### B. Plaintiff's Motion for Partial Summary Judgment

Plaintiff moves for summary judgment on liability only and argues that (1) Plaintiff was entitled to and did terminate his employment with Defendant without cause pursuant to the "no

---

[5] Defendant could also terminate the relationship with Plaintiff pursuant to reasons enumerated in Section 5B of the Employment Agreement.

17

reason" provision, and (2) Defendant's unacceptable change of Plaintiff's manager gave Plaintiff "Good Reason" to resign. (PMSJ at 20-29.) Because the Court has established that genuine issues of material fact exist as to whether Defendant cured the "Good Reason" basis for Plaintiff's resignation, the Court will only address whether Plaintiff has established that he is entitled to summary judgment as to his resignation for "no reason."

"Under Delaware law, plaintiffs must establish the following three elements to succeed on a breach of contract claim: (1) the existence of a contract, whether express or implied; (2) breach of one or more of the contract's obligations; and (3) damages resulting from the breach." *Geico Gen. Ins. Co. v. Green*, 308 A.3d 132, 140 (Del. 2022). Here, the parties do not dispute that the Employment Agreement is the operative contract, and the Employment Agreement resulted from negotiations between the parties. (PMSJ at 5; ECF 49-2 ¶¶ 5-6 (Defendant's CSMF).) Plaintiff argues that Defendant breached the Employment Agreement by failing to pay Plaintiff Separation Pay upon his resignation from Gallagher. Defendant Gallagher argues that Plaintiff's resignation for no reason does not entitle him to Separation Pay because the no reason provision did not result from a meeting of the minds, and Delaware courts enforce specific over general provisions when such provisions conflict. The Court addressed these arguments above and found the no reason language to be unambiguous and enforceable. Section 5D of the Employment Agreement provides that "in the event the Company terminates Employee's employment for reasons other than as set forth in Section 5.B above or by Employee for 'Good Reason' (as defined below), or for no reason by the Company or Employee, the Company shall be obligated to pay to Employee Separation Pay[.]" (ECF 44-3, Ex. B.) Accordingly, the Separation Pay obligation applies to both the Good Reason and no reason clauses. The parties do not dispute that Plaintiff resigned. The parties do not dispute that Defendant has not paid Plaintiff Separation Pay. This failure to pay Separation Pay is

a breach of Section 5D of the Employment Agreement. Plaintiff asserts that he was damaged by this breach because he did not receive the Separation Pay to which he was entitled. Plaintiff has established breach of contract, and his motion for summary judgment on liability only is **GRANTED**.

## IV. CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment (ECF 46) is **DENIED**, and Plaintiff's partial motion for summary judgment (ECF 44) is **GRANTED**. An appropriate order follows.

*/s/ Jamel K. Semper*
**HON. JAMEL K. SEMPER**
**United States District Judge**

Orig: Clerk
cc: James B. Clark, U.S.M.J.
Parties